## In re WARNER COMMUNICATIONS SECURITIES LITIGATION.

This Document Relates to All Actions.

No. 82 Civ. 8288 (JFK).

United States District Court,
S.D. New York.

Aug. 20, 1985.

Wolf Haldenstein Adler Freeman & Herz by Daniel W. Krasner, Fred T. Isquith and Milberg, Weiss, Bershad, Specthrie & Lerach by Melvyn I. Weiss, Jerome M. Congress, New York City, Berger & Montague, P.C. by Sherrie R. Savett, Stephen A. Whinston, Philadelphia, Pa., for plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison by Arthur L. Liman, Leslie Gordon Fagen, C. William Phillips, New York City, for Corporate defendants Warner Communications, Inc. and Atari, Inc.

Skadden, Arps, Slate, Meagher & Flom by Barry H. Garfinkel, Timothy A. Nelsen, Jeremy A. Berman, Daniel F. DeVita, New York City, for individual defendants.

Elliott J. Weiss, New York City, for objector Stephen J. Gross.

## OPINION and ORDER

KEENAN, District Judge:

The parties to this action seek an order, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("FRCP"), approving their proposed settlement of this class action. In addition, plaintiffs' counsel have applied for an order awarding them attorneys' fees for services rendered and reimbursement of expenses. For the reasons stated below, the Court approves the proposed settlement and grants plaintiffs' counsels' application for the award of fees and expenses.

## BACKGROUND

This action is a consolidation of 19 actions, most of which were begun in December 1982. Eighteen were brought on behalf of persons who, during the period from March 3, 1982 through December 8, 1982, purchased Warner Communications Inc. ("Warner") common stock, common stock purchase warrants, call options on Warner shares, or who sold put options covering Warner shares. In addition, one plaintiff sued derivatively on behalf of Warner.[1]

---

1. Under the settlement proposal, the Court will dismiss the derivative action, comprised solely of state law claims. The Delaware Court of

Chancery has before it the same claims by the same plaintiff in the parallel derivative action

The Consolidated Amended Complaint ("Complaint"), filed, in July, 1983, alleges that certain defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("the 1934 Act"), Rule 10b–5 promulgated thereunder, and the common law by engaging in a common scheme or conspiracy, the purpose of which was to cause the market prices of Warner securities to be artificially inflated during the class period. Defendants allegedly issued a series of false and misleading public statements that led the investing public to believe that Warner's operations would continue their unbroken pattern of dramatic growth and increasing profits and that Warner's competitive position would be maintained or improved. In particular, the Complaint alleges that materially misleading information was disseminated about the performance of Warner's former subsidiary, Atari, Inc. ("Atari"), which manufactured and marketed home video games and cartridges as well as coin-operated video arcade games. Warner allegedly stated that Atari's spectacular and highly profitable growth during 1981 was expected to continue in 1982. Misleading statements were also alleged with respect to the operations of two other Warner divisions, Warner Amex Cable Communications ("Warner Cable") and Knickerbocker Toy Company, Inc. ("Knickerbocker").

Plaintiffs alleged that defendants failed to disclose during the class period that Atari's market share in the home video game market was sharply diminished due to increasing competition, that its growth rate was slowing, that its products were no longer state of the art, that its rate of sales and profitability were declining, that its home video game segment was experiencing a serious sales slowdown, particularly in sales of game cartridges, and that it was experiencing cancellations in orders for its products at unprecedented rates. Plaintiffs further alleged that defendants had no reasonable basis for making statements during the class period that Warner would achieve record 1982 profits of between $5.00 and $5.75 per share. Plaintiffs contended further in their Complaint that certain individual defendants were selling large portions of their Warner holdings while in possession of this material adverse information about Warner which had not been publicly disclosed.

On December 8, 1982, the true status of Warner's operations and financial position became public. Warner announced that Atari's sales were disappointing, and that cancellations of sales of cartridges and a write-off exceeding $20 million in connection with Warner's Knickerbocker unit would result in Warner's fourth quarter earnings being approximately 50% less than they had been in the prior comparable period and its 1982 fiscal results would be considerably less than previously represented to the investing public. The price of Warner common stock dropped, falling over 16 points the next day. Other Warner securities were similarly affected.

Defendants in this action include Warner, Atari and certain present and former officers and directors of Warner and Atari. In essence, all the defendants are charged with a classic fraud-on-the-market and the individual defendants are charged with insider trading. They deny the allegations of the Complaint.

After lengthy negotiations, the parties stipulated to certification of the alleged class, without waiver of defendants' rights to later challenge that certification, and this Court so ordered that stipulation on February 17, 1984. The class as certified consisted of all persons or entities who, during the period from March 3, 1982 to and including December 8, 1982: (i) purchased Warner common stock, (ii) purchased warrants to purchase Warner common stock, (iii) purchased call options to acquire Warner common stock that remained unexpired on December 8, 1982, or (iv) sold put options to dispose of Warner common stock which were open positions as to them on December 8, 1982. Pursuant to this Court's Order, notice of the pendency of these class actions was subsequently

and under the proposed settlement of that ac-

tion, those claims will be addressed.

mailed to approximately 100,000 potential class members, and was published in summary form in both *The Wall Street Journal* and *The New York Times.*

Extensive discovery was had in this case. During the second half of 1983, plaintiffs reviewed over 80,000 pages of documents produced, pursuant to discovery demands, by defendants and numerous third parties. Plaintiffs also reviewed depositions of Warner and Atari officials taken during the course of a Securities and Exchange Commission ("SEC") investigation. Only after substantial discovery was completed did settlement negotiations commence. Those negotiations ultimately yielded the settlement proposal described below.

## DISCUSSION

### A. *Settlement Proposal*

The proposed settlement provides that defendants shall pay $17,250,000.00, plus accrued simple interest at the rate of 8% per annum from January 1, 1985. The settlement fund shall also include $290,-000.00, plus accrued interest, which represents the amounts paid by defendants Groth and Kassar, officials of Atari, to the SEC as disgorgement of their profits on insider sales. The settlement agreement also requires defendant Warner to bear the cost of providing notice to the class members and settlement administration, which represents a benefit to the class of at least $200,000.00. The total value of the settlement, as of July 23, 1985, the date of the settlement hearing, is approximately $18,-600,000.00.

The particulars of the complex method of allocation of the settlement fund among the class members need not be explained at length in this opinion. Suffice it to say, however, that the proposal recognizes that the potential for recovery varies among class members depending on whether they continued to hold their Warner securities at the end of the class period and when during the class period they effected their Warner securities transactions. Discovery indicated that more information was available to defendants concerning Warner's and Atari's earnings prospects as 1982 drew to a close than was available in earlier periods. For this reason, class members purchasing between March 3 and August 1, 1982 can expect recovery of up to 5% of their claims. Purchasers during the third and early fourth quarters, from August 2 through November 4, will receive up to 25% of their claims. Late 1982 purchasers—those who bought between November 5 and December 8, when more information about 1982 prospects was available—will receive up to 75% of their claims.

### B. *Judicial Review of the Settlement Proposal*

■ In deciding whether to approve this settlement proposal, the court starts from the familiar axiom that a bad settlement is almost always better than a good trial. This case is an exception to that rule only to the extent the settlement is a very good one. There is little doubt that the law favors settlements, *Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 358 (E.D.N.Y.1982), *aff'd*, 721 F.2d 881 (2d Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984), particularly of class action suits, *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). To withstand judicial scrutiny, the settlement need only be "fair, reasonable and adequate." *Weinberger*, 698 F.2d at 73; *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied sub nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). In making this determination, the Court's role is to compare the terms of the compromise with the likely rewards of litigation. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *Weinberger*, 698 F.2d at 73; *In Re "Agent Orange" Product Liability Litigation*, 597 F.Supp. 740, 762 (E.D.N.Y. 1984); *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 163 (S.D.N.Y.1983). In *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), the Second Circuit provid-

ed a nonexhaustive list of factors to consider in reviewing a settlement proposal:

> (1) the complexity, expense and likely duration of the litigation ...; (2) the reaction of the class to the settlement...; (3) the stage of the proceedings and the amount of discovery completed...; (4) the risks of establishing liability ...; (5) the risks of establishing damages ...; (6) the risks of maintaining the class action through the trial ...; (7) the ability of the defendants to withstand a greater judgment ...; (8) the range of reasonableness of the settlement fund in light of the best possible recovery ...; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation .... (Citations omitted).

*Accord Malchman v. Davis,* 706 F.2d 426, 433–34 (2d Cir.1983). It is also appropriate to examine the negotiating process that gave rise to the settlement. *Weinberger,* 698 F.2d at 74. The proper inquiry in this regard is whether the settlement was achieved through "arm's length negotiations" by counsel who have "the experience and ability...necessary to effective representation of the class's interests." *Id.*

### 1. *Risk In Establishing Liability*

■ Plaintiffs' principal claim against the defendants is that they made material misstatements, *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976), with actual knowledge of falsity or in reckless disregard for the truth (i.e. scienter), *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976), in violation of § 10(b) of the 1934 Act, and Rule 10b–5 promulgated thereunder. Plaintiffs, therefore, would have the burden of proving that defendants not only possessed information regarding the performance of Atari which, if publicly disseminated, would have materially affected the price of the stock, but also that defendants withheld that information from the investing public either with actual intent to deceive, manipulate or defraud or that de-

fendants recklessly disregarded the facts and their consequences.

Plaintiffs' major claims are that beginning in March 1982 and throughout the class period ending December 8, 1982, adverse trends began to develop concerning the business of Atari which defendants should have disclosed. Those adverse developments included: an increasing rate of cancellations of orders for video computer hardware and cartridges; accumulation of excess inventories of those items on Warner's and on retailers' shelves due to declining demand for the product in the marketplace; increasing competition in the home video market causing saturation of the market, cutting into the demand for Atari's products and at the same time causing Warner to experience a declining profit margin because of the necessity to cut prices, particularly of cartridges; and the lack of any significant "hit" cartridges, other than "Pac Man," during the class period. Discovery indicated that these problems became more severe and more obvious over time.

Plaintiffs would have attempted to meet their burden of proving scienter, as required under Rule 10b–5, principally by showing that (i) at least 13 of 16 individual defendants sold significant portions of their personal holdings of Warner stock at the high prices prevailing during the class period and profited handsomely before the adverse information was disclosed, and (ii) Warner decided during the third quarter of fiscal 1982 to expand the third quarter from thirteen to fourteen weeks, allowing Warner to meet its forecasts for the quarter.

Defendants, on the other hand, would argue that they reasonably believed that their class period statements were accurate and that the growth experienced by Atari in 1981 would continue. First quarter 1982 results were basically on target with their projections and Pac-Man became a national phenomenon and Atari's largest selling cartridge. The cancellations of orders and inventory build-up occurred gradually and could not be viewed as a trend until months

after it began. Both the second and third quarter results for Atari and Warner significantly surpassed 1981's record totals. Since the fourth quarter, encompassing Thanksgiving and Christmas, was historically Atari's strongest quarter at retail, Warner had reason to believe that its announced goals would be met by significant fourth quarter results. This belief was further strengthened by Atari's efforts to develop new cartridges for fourth quarter release based upon the popular movies ."E.T." and "Raiders of the Lost Ark." Defendants would also present evidence showing that during 1982, in August and again in October, they lowered their sales and revenue projections, taking into account cancellations of orders and a slower rate of new orders. Therefore, they would argue, since their statements about growth were consistent with these revised downward projections, there was no need to disclose individual negative factors like cancellations. Other positive factors balanced out the negatives and were taken into consideration in the internal budgets they prepared which supplied the basis for their public reports. Defendants would point to the fact that in fiscal 1982, Warner actually experienced an 11% increase in earnings per share over their record year of 1981. Defendants would argue further that the market had simply overreacted to their December 8 press release containing a revised earnings estimate.

With respect to the issue of scienter, each of the 16 individual defendants would have presented different personal financial or tax reasons to justify their sale of Warner securities during the class period, reasons alleged to be completely independent of Warner's financial condition. At deposition, defendant Ross, for example, explained that his sale was made pursuant to an overall tax plan that had been created by a financial adviser long before the class period. Defendant Ross testified that he had decided in late 1981 to sell a large enough number of shares of his Warner stock to be able to realize $18,000,000, thus allowing him to reduce his liabilities resulting from his exercise of a class of Warner stock options which were expiring in early 1982. Ross testified that all Warner officers and directors had similar tax problems because the tax law held that the exercise of the expiring options resulted in taxable income to the option-holder even though the option-holder received no cash from the exercise and indeed had to pay the exercise price. The options nevertheless had to be exercised or they would have expired. In order to pay the taxes, Ross and others sold their Warner stock. Even though Ross had decided in late 1981 to sell the stocks to pay these liabilities, he determined that he would not actually sell the stock until his intention to sell was disclosed in the proxy statement for the May 28, 1982 Annual Meeting and until he had obtained further options under a new stock option plan that allowed him to maintain his relative equity position in Warner.

Defendants would assert that the addition of a week to the third quarter was a decision they made without consideration of the financial results that were reported. According to deposition testimony, Warner was operating on a 52-week year and every seven years an additional week had to be added to a quarter, to keep close to the calendar year end. This week fell in 1982 and the decision was made to add it to the third quarter, allegedly independent of any shortfalls at Atari.

Defendants would attempt to characterize the plaintiffs' case as one that does not challenge the actual financials of Warner during the class period, but only alleges that Warner made faulty projections or prognostications or expressed faulty opinions about future performance. Defendants would argue, with some support, that such predictions are not actionable under § 10(b) and Rule 10b–5 if defendants had a reasonable basis upon which to make such statements in view of the facts known within the company. *See, e.g., Marx v. Computer Sciences Corporation*, 507 F.2d 485, 489–90 (9th Cir.1974); *Myzel v. Fields*, 386 F.2d 718, 734 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *REA Express, Inc. v.*

*Interway Corp.*, 410 F.Supp. 192, 197–98 (S.D.N.Y.), *rev'd on other grounds*, 538 F.2d 953 (2d Cir.1976). Plaintiffs would argue that Warner's and Atari's negative trends were of a long-standing nature, and that their internal budgets failed to adequately account for the cancellations, inventory accumulations and reduced rate of orders. Warner, however, could rely on its own internal budgets, which were revised downward several times during the class period, Atari's record sales around Thanksgiving time and the suddenness of the business' deterioration immediately after Thanksgiving. It is clear that whether Warner had a reasonable basis for its public statements would have been the subject of a lengthy and hotly contested evidentiary dispute.

Plaintiffs undoubtedly thought they could win this case, though they readily concede that defendants were not without evidence to support their defense. *See West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 743–44 (S.D.N.Y.1970) ("It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced"), *aff'd*, 440 F.2d 1079 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Plaintiffs further admit that discovery revealed "no smoking gun." (Plaintiffs' Memorandum in Support of the Proposed Settlement at 44). Indeed, it is evident that, had this case gone to trial, there exists a substantial risk that plaintiffs would have failed to successfully establish defendants' liability.

This risk is further borne out by the SEC's action with respect to the underlying facts of this case. Shortly after the instant action was commenced in December 1982, the SEC initiated its own investigation of Warner, Atari and certain of their important officers and directors. The SEC's investigation focused primarily on insider trading, rather than the broader open market fraud allegations of this litigation. The SEC conducted an extensive review of the corporate defendants' records and several depositions of their top officials. At what appeared to be the conclusion of the SEC's investigation, the SEC compelled Atari's top officers, defendants Kassar and Groth, to disgorge profits realized from the sale of Warner stock only during the period from November 17 to December 8, the date of Warner's announcement of Atari's decline.[2] The SEC took no action against any Warner official. Surely, the limited action taken by the SEC, after a comprehensive investigation, can properly be considered evidence of plaintiffs' risk that they may not be able to establish defendants' liability, particularly on the insider trading claims.

A further risk for plaintiffs exists in the unsettled state of the law as to whether options purchasers or sellers have standing to maintain a claim under § 10(b) of the 1934 Act. Courts outside the Second Circuit have split on this issue. *Compare In re Digital Equipment Securities Litigation*, 601 F.Supp. 311, 315 (D.Mass.1984) (upholding such claims) *and Backman v. Polaroid Corp.*, 540 F.Supp. 667, 671 (D.Mass.1982) (same) *with Laventhall v. General Dynamics Corp.*, 704 F.2d 407, 414 (8th Cir.) (dismissing claim), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983) *and In re McDonnell Douglas Corp. Securities Litigation*, 567 F.Supp. 126, 127 (E.D.Mo.1983) (same). In fact, the cases decided in this Court, while factually distinguishable, can be read to support contrary legal positions. *Compare Lloyd v. Industrial Bio-Test Laboratories, Inc.*, 454 F.Supp. 807, 811 (S.D.N.Y.1978) (option purchasers granted standing to sue) *with Desimone v. Industrial Bio-Test Laboratories, Inc.*, 80 F.R.D. 112, 113 (S.D.N.Y.1978) (class of options purchasers was not certified because the option class was not carefully defined).

In view of the factual disputes surrounding the issue of defendants' liability, the outcome of the SEC's investigation into the affair and the unsettled legal issues involved, plaintiffs certainly bear a substantial risk of losing this case at trial.

---

**2.** As noted above, these disgorged funds will become part of the settlement fund.

### 2. Risk in Establishing Causation/Damages

Even if plaintiffs are successful in establishing that defendants intentionally or recklessly misrepresented Warner's financial condition, it is yet another obstacle for plaintiffs to prove that defendants' misrepresentations caused the damages allegedly sustained by plaintiffs.

■ The Second Circuit employs the "out-of-pocket" damage measure in Rule 10b–5 cases. *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir.1971); *Bonime v. Doyle*, 416 F.Supp. 1372, 1384 (S.D.N.Y. 1976), *aff'd mem.*, 556 F.2d 554 (2d Cir.), *cert. denied*, 434 U.S. 924, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977); *Quintel Corp. N.V. v. Citibank, N.A.*, 596 F.Supp. 797, 802 (S.D.N.Y.1984); *Freschi v. Grand Coal Venture*, 588 F.Supp. 1257, 1259 (S.D.N.Y. 1984). Under this measure, a defrauded buyer may recover the difference between the price paid for the stock and the "fair value" of the stock (value absent the fraud), as of the date of his or her purchase. *See Sirota v. Solitron Devices Inc.*, 673 F.2d 566, 577–78 (2d Cir.), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982).

Plaintiffs may argue that the "fair value" of the stock should be drawn from its market price following revelation of the fraudulently withheld material. *See Harris v. American Invest. Co.*, 523 F.2d 220, 226–27 (8th Cir.1975); *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *In re Brown Co. Sec. Litigation*, 355 F.Supp. 574, 588 (S.D.N.Y.1973); *SEC v. Texas Gulf Sulphur Co.*, 331 F.Supp. 671, 672 (S.D.N.Y.1971). Defendants will likely counter that the post-disclosure market price of the stock has been affected by factors unrelated to the disclosure. *See Sirota*, 673 F.2d at 577; *Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Burger v. CPC Int'l, Inc.*, 76 F.R.D. 183, 187–88 (S.D.N.Y.1977); *Bonime*, 416 F.Supp. at 1384. Indeed, defendants bear no responsibility for the impact of so-called nonactionable factors, such as general market conditions. *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 49 n. 22 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). In this case, during most of the class period, Warner stock was dropping in price even though the fraud, designed to inflate the price, was allegedly in operation. This price decline, from about $55 per share in August 1982 to $37 per share a month later, followed trends throughout the industry. In the next three months, through early December, prices of Warner stock, and the stock of its competitors, even in the face of negative publicity, rose dramatically. While Warner stock fell dramatically after the December 8 announcement, the price of stock throughout the industry also fell abruptly during this time.

Thus, plaintiffs are faced with a situation where during that part of the class period in which a stronger case can be made for liability, the market price of Warner and similar stocks was fluctuating dramatically. At one point, the price may have far exceeded fair value because of frenzied buying, not fraud. Weeks later, coincidental to revelation, the price may have been lower than fair value due to panic selling and a general downturn in the market. Under these circumstances, the degree to which the post-revelation decline is attributable to disclosure, and to what extent the decline was the result of nonactionable market and industry trends is difficult to ascertain. A market analyst consulting expert retained by plaintiffs' counsel concluded that by employing a conservative, but reasonable, analysis only 17% of the decline in Warner's stock price after revelation was due to the fraud, as distinguished from specific market (other game companies) and general market conditions.

■ Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages. *See, e.g., Sirota*, 673 F.2d at 576–78; *Burger*, 76 F.R.D. at 187–88. In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which

damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

There is a separate and substantial question as to whether those persons who both bought and sold securities during the class period ("in and outers") were damaged at all. *See Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1341–46 (9th Cir. 1976) (Sneed, J., concurring). Plaintiffs would argue that these traders were hurt by defendants' conduct, particularly those who sold late in the class period after there was likely to have been some leakage in the marketplace about Warner's problems. They may not have had the opportunity to recoup the amount of artificial inflation prevailing at the time of their earlier purchases. Defendants would argue that any price inflation experienced by a class member on purchase would be recovered on the inflated sale within the class period. Indeed, this view was supported by plaintiffs' expert consultant. It is clear that there exists room for debate on these critical causation/damage issues.

3. *Range of Reasonableness of the Settlement Fund In Light of the Best Possible Recovery and All the Attendant Risks of Litigation*

The Second Circuit has held that:

The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.... In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.

*Grinnell Corp.*, 495 F.2d at 455 n. 2; *accord Weinberger*, 698 F.2d at 65; *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463–64 (2d Cir.1982).

■ This case represents a material percentage recovery to plaintiffs in light of all the risks of litigation. Plaintiffs' consulting damage expert has determined that the damages for certain portions of the class,

in particular, the "in and outers", would represent at most a very small portion of total damages and those class members might have difficulty establishing that they sustained any damages attributable to the fraud. Thus, he concluded that damages to the segments of the class most likely to recover, that is, purchasers of common stock, warrants and calls who held those positions beyond the December 8, 1982, announcement and sellers of puts, are in the range of $148 million. Under the settlement proposal, these persons will recover approximately 12% of a reasonable damage figure. The proposal takes into consideration the impact of general industry and market factors, *Rolf*, 570 F.2d at 49 n. 22; *Bonime*, 416 F.Supp. at 1384; *Blackie*, 524 F.2d at 909, n. 25; *Burger*, 76 F.R.D. at 187–88, and discounts the market losses to account for such factors.

In light of the risks of establishing liability and damages, this large cash settlement is surely within the range of reasonableness. *Cf. City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y. 1972) (3.2% to 3.7% of the potential recovery "well within the ball park"), *aff'd in part, rev'd on other grounds*, 495 F.2d 448 (2d Cir.1974).

4. *Complexity, Expense and Likely Duration of Litigation*

As the foregoing discussion indicates, this action is legally and factually complex. Although much discovery has been conducted, much would remain if the parties were to go to trial. Plaintiffs estimate that a trial would last six to eight weeks. In view of the complexity of the issues and the thoroughness of all counsel, the Court considers that to be a conservative estimate. In addition, appeals could reasonably be expected to follow any verdict.

5. *Stage of the Proceedings and the Amount of Discovery Completed*

Discovery is fairly advanced and the parties certainly have a clear view of the strengths and weaknesses of their cases.

### 6. *Risk of Maintaining the Class Action Through the Trial*

The class was conditionally certified upon the parties' stipulation thereto. In view of the number of plaintiffs and the length of the class period, defendants may move for decertification at trial based on the lack of commonality among different segments of the class. The threat of decertification makes settlement all the more attractive to plaintiffs.

### 7. *Ability of Defendants to Withstand a Greater Judgment*

In *Grinnell Corp.*, Judge Metzner noted that the "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures." 356 F.Supp. at 1389. At the settlement hearing, counsel for the corporate defendants stated that "if we lost it it could very well have meant bankruptcy. That is what the damages could have been if left to a jury." (Transcript, dated July 23, 1985, at 21). Consequently, the certainty of payment of the settlement is advantageous to the class.

### 8. *Reaction of the Class to the Settlement*

█ On or about April 29, 1985, more than 104,000 copies of a detailed notice were sent to persons who appeared to be class members and to banks, brokers and nominees, for mailing to class members who appear on their records. On May 6, 1985, notice was published in the *New York Times* and the *Wall Street Journal*.[3] In view of the scope of notice, it is rather incredible that only two objections to the settlement were filed with the Court, one of which was voluntarily withdrawn prior to the settlement hearing.[4]

### 9. *Arms Length Negotiations*

█ From this Court's unique vantage point, it is clear that this settlement was reached through arms-length negotiations by preeminent counsel on both sides of the case. The process resulted in a very fair settlement. It is not for this Court to substitute its judgment as to a proper settlement for that of such competent counsel in view of the fairness of the settlement to the class members.

█ The prospect of recovery in this case, had plaintiffs proceeded to trial, was less than certain and, in any event, would likely have taken years to be realized. Under the circumstances of this case, therefore, the Court finds that the settlement proposal is more than fair and merits approval.

### C. *Attorneys' Fees*

Plaintiffs' class counsel jointly move this Court for an order awarding attorneys' fees for services rendered and for reimbursement of expenses. Plaintiffs' counsel seek $4,385,000 in fees, slightly less than 25% of the settlement fund, and reimbursement of $124,090.08 in expenses, including experts' fees. The fees and expenses of plaintiffs' counsel are to be extracted from the settlement fund.

█ In analyzing the propriety of the application, the Court must look to the following factors: (i) time and labor expended by counsel, (ii) magnitude and complexity of the litigation, (iii) risk of the litigation,

---

**3.** Under Rule 23(c)(2) of the FRCP, plaintiffs' counsel must provide "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732 (1974). The notice procedures employed in this case clearly comply with the requirements of Rule 23 and the due process clause. *See, e.g., Weinberger,* 698 F.2d at 71–72; *Grunin v. International House of Pancakes,* 513 F.2d 114, 121 (8th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

**4.** There were four other objections to settlement, of an inconsequential nature, sent to plaintiffs' counsel but not filed in the Court. These are addressed below. *See infra* pp. 751–754. Approximately, 222 class members, a fraction of one percent of the class, opted out of the class. In addition, there was one objection to the attorneys' fees application of plaintiffs' counsel.

(iv) quality of representation, (v) requested fee in relation to the settlement, and (vi) public policy considerations. *See Grinnell Corp.*, 495 F.2d at 470; *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied sub. nom. Patlogan v. Dickstein*, 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973); *Cranston v. Hardin*, 504 F.2d 566, 578 (2d Cir.1974).

### 1. *Time and Labor Expended*

■ The first step in valuing an attorney's services is the calculation of the "lodestar" amount. *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1098 (2d Cir.1977). This is done by "multiplying the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area." *Id.* Each of the 21 petitioning plaintiffs' law firms has submitted individual affidavits describing their activities and contributions, the amount of time expended by individual lawyers, law clerks and paralegals, and the lodestar value of that time based on current hourly billing rates. The Court has reviewed these papers, together with the contemporaneous time sheets of counsel, and found them to be in proper order. These records indicate that, in the course of drafting pleadings, obtaining class certification, conducting extensive discovery, negotiating settlement and the like, petitioning firms expended 13,108 hours of attorney, law clerk and paralegal time. Billing these hours at varying rates, depending on who was doing the work, counsel arrived at a lodestar of $1,942,528.99 on a noncontingent basis.

■ Calculation of the lodestar, however, is simply the beginning of the analysis. Courts have recognized that in so-called "common fund" cases, where the attorneys' fees are extracted from the settlement fund, emphasis should be placed more on the quality of the representation, the complexity of the litigation, the benefit conferred on the class and the risk that the litigation may yield no reward than on doctrinaire adherence to the lodestar. *Lindy*

*Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir.1976); *Grinnell Corp.*, 495 F.2d at 471. One court has explained the reasoning as follows:

> Where success is a condition precedent to compensation, 'hours of time expended' is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a patient would think he is entitled to more.

*In re King Resources Co. Securities Litigation,* 420 F.Supp. 610, 631 (D.Colo.1976); *accord Sampsell v. Monell*, 162 F.2d 4, 6–7 (9th Cir.1947). Accordingly, we turn to the above-mentioned factors.

### 2. *Complexity of the Litigation*

■ The complexity of this litigation need not be recounted again at length. *See supra* pp. 741–45. Analyzing the nature of defendants' conduct and the varying positions of the class members was a Herculean task. Such complexity surely justifies the application of a multiplier to the lodestar. *Lindy*, 540 F.2d at 115–16; *Alpine Pharmacy*, 481 F.2d at 1050; *Arenson v. Board of Trade of City of Chicago*, 372 F.Supp. 1349, 1352 (N.D.Ill. 1974).

### 3. *Risk of the Litigation*

■ As with the complexity of this case, plaintiffs' risk that they would not obtain any meaningful recovery at trial is substantial and has been reviewed above at length. *See supra* pp. 741–45. Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award. *Grinnell Corp.*, 495 F.2d at 470; *Lindy*, 540 F.2d at 117; *In re Equity Funding Corp. of America Sec. Litigation*, 438 F.Supp. 1303, 1332 (C.D.Cal.1977).

Even a victory at trial is not a guarantee of ultimate success. If plaintiffs were suc-

cessful at trial and obtained a judgment for substantially more than the amount of the proposed settlement, the defendants would appeal such judgment. An appeal could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself. *See Chas. Pfizer*, 314 F.Supp. at 743–44; *see, e.g., MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1166–69 (7th Cir.) ($1.8 billion antitrust judgment was remanded for a new trial and the second trial produced a dramatically smaller award), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *Telex Corp. v. International Business Machines Corp.*, 510 F.2d 894, 933 (10th Cir.) (per curiam) (reversed a $259.5 million judgment for plaintiff and awarded an $18.5 million counterclaim judgment for defendant), *cert. dismissed*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 276–308 (2d Cir.1979) (multimillion dollar judgment after a lengthy trial was reversed), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Trans World Airlines, Inc. v. Hughes*, 312 F.Supp. 478, 479, 485 (S.D.N.Y.1970), *aff'd*, 449 F.2d 51 (2d Cir.1971), *rev'd*, 409 U.S. 363, 366, 93 S.Ct. 647, 650, 34 L.Ed.2d 577 (1973) ($145 million judgment was overturned, after years of litigation and appeals).

■ Another manifestation of the uncertainty of the ultimate outcome, and one that is traditionally considered by courts in the context of a fee petition, relates to the activities of governmental agencies in taking actions which parallel plaintiffs' complaints. *See, e.g., Arenson*, 372 F.Supp. at 1353. In this case, after a thorough investigation, which included the review of tens of thousands of documents and the taking of numerous depositions, the Securities and Exchange Commission brought limited enforcement actions against only two defendants, Kassar and Groth, for insider trading in the days immediately preceding Warner's December 8, 1982 announcement. Thus, the settlement presented to this Court has been achieved without any assistance from federal or state agencies.

Another factor generally considered in assessing the risk of litigation in the context of a fee award is the delay in receipt of payment for services rendered. *See, e.g., Lindy*, 540 F.2d at 117; *Equity Funding*, 438 F.Supp. at 1332. To date, plaintiffs' counsel have invested over 30 months of their services in this case and advanced substantial disbursements despite the possibility that the lawsuit would be unsuccessful.

The collective risks taken by plaintiffs' counsel surely militate in favor of enhancing the lodestar.

### 4. Quality of Representation

■ The quality of plaintiffs' counsels' representation of the class is a key factor in a court's consideration of counsels' fee request. In the context of the instant case, the quality of plaintiffs' counsels' work can be measured by a number of factors, including the benefit obtained for the class, the efficiency of plaintiffs' counsel's activities, and the quality of opposing counsel.

■ The quality of work performed in a case that settles before trial is perhaps best measured by the benefit obtained. *Merola v. Atlantic Richfield Company*, 515 F.2d 165, 168 (3d Cir.1975); *see Lindy*, 540 F.2d at 117–18; *Grinnell Corp.*, 495 F.2d at 470. The benefit obtained here is substantial. A cash fund of more than $18.4 million has been created without having to undertake the risks to the class incident to trial and appeals. In addition, defendants have agreed to bear the significant costs of notice and settlement administration, estimated to be an added benefit worth at least $200,000. Those elements combined with the interest already accrued make this one of the largest recoveries in a securities class action.

The quality of work of plaintiffs' counsel on this case is also demonstrated by the efficient manner of prosecution. Rather than engaging in long months of extensive motion practice over the adequacy of the complaint and the certification of the class, plaintiffs' counsel were able to successfully

negotiate these issues with defendants and proceed directly to discovery on the merits. Absent this agreement, plaintiffs' counsel would have been required to spend hundreds of additional hours researching issues of law and preparing legal memoranda responding to motions or other legal arguments raised by defendants on these issues. This efficient prosecution enabled the plaintiffs' counsel to concentrate their energy on the complex issues of the lawsuit.

The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work. *See, e.g., Equity Funding*, 438 F.Supp. at 1337; *King Resources*, 420 F.Supp. at 634; *Arenson*, 372 F.Supp. at 1354. Defendants in this action were represented by the highly prestigious law firms of Paul, Weiss, Rifkind, Wharton & Garrison, which represented the corporate defendants, and Skadden, Arps, Slate, Meagher & Flom, which represented the individual defendants. In-house counsel for Warner was also active. Plaintiffs were thus confronted in this litigation by some of the most skilled and respected firms and practitioners in New York City.

Against this formidable array of legal talent retained by defendants, plaintiffs were able to present a lead counsel team which functioned as a single law firm and had the cooperation of 18 additional firms from around the country. Finally, the high standing and extensive prior experience of plaintiffs' counsel are also relevant in determining whether a multiplier to the fee should be awarded. *E.g., Angoff v. Goldfine*, 270 F.2d 185, 192–93 (1st Cir.1959); *Paris v. Metropolitan Life Insurance Company*, 94 F.Supp. 356, 358 (S.D.N.Y. 1950). At the settlement hearing, defense counsel conceded that plaintiffs' counsel constitute the "cream of the plaintiffs' bar." (Transcript at 23). The Court cannot find fault with that characterization.

■ In view of the complexity of the case, the risk that litigation would produce no recovery and the quality of representation provided by plaintiffs' counsel, plaintiffs' counsel seek to apply a multiplier of approximately 2.26 to the lodestar. Such a multiplier appears to be at the lower end of the range of multipliers used in other large cases. *See, e.g., In re General Public Utilities Securities Litigation*, [1983–84 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,566, at 97,232 (D.N.J.1983) (3.45 times fixed fee rate); *Arenson*, 372 F.Supp. 1349, 1359 (four times hourly rate); *Pacific Plumbing Supply Co. v. Crane Co.*, [1982–1 Trade Cases] (CCH) ¶ 64,473, 72,649 (W.D.Wash. 1982) (multiplier of 3.0 times hourly rate); *In re Cenco, Inc. Securities Litigation*, 519 F.Supp. 322, 326–28 (N.D.Ill.1981) (four times hourly rate awarded for lead counsel and two for other counsel); *Municipal Authority of Bloomsburg v. Pennsylvania*, 527 F.Supp. 982, 999–1000 (M.D.Pa.1981) (multiple of 4.5 times non-contingent rate); *Keith v. Volpe*, 86 F.R.D. 565, 575–77 (C.D. Cal.1980) (multiple of 3.5); *Miller v. Fisco, Inc.*, [1978 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,348, at 93,187 (E.D.Pa.1978) (2.8 times hourly rate); *Fried v. Utilities Leasing Corp.*, [1976–77 Tr. Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,695, at 90,429 (E.D.Pa. 1976) (four times hourly rate); *In re Gypsum Cases*, [1974–2 Trade Cases] (CCH) ¶ 75,272, at 97,775 (N.D.Cal.1974) (three times hourly rate).

### 5. *Requested Fee in Relation to the Size of the Settlement*

■ The Supreme Court has recently stated that the fee request must be looked at in terms of the percentage it represents of the total recovery. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1549–50 n. 16, 79 L.Ed.2d 891 (1984). Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%–50% range in class actions. *See In Re Pepsico Securities Litigation*, 82 Civ. 8403 (ADS) (S.D.N.Y.) (Order of April 26, 1985) (20% of $21.5 million settlement fund); *In re New York City Municipal Securities Litigation*, Fed.Sec. L.Rep. (CCH) ¶ 91,419, at 98,085 (S.D.N.Y. 1984) (fees and disbursements: almost 33% of $13,450,000 settlement); *Weinberger v. Flow General, Inc.*, [1984 Tr. Binder] Fed. Sec.L.Rep. (CCH) ¶ 91,541, at 98,731 (S.D.

N.Y.1984) (25% of settlement); *Amsterdam v. Turbodyne Corp.*, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,976, at 91,-031 (S.D.N.Y.1981) (29% of the settlement); *Richardson v. White Weld & Co., Inc.*, [1981 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,968, at 90,980 (S.D.N.Y.1981) (27% of settlement); *Van Gemert v. Boeing Co.*, 516 F.Supp. 412, 418–22 (S.D.N.Y.1981) (22% of settlement); *Clark v. Cameron-Brown Co.*, [1981 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,014 (M.D.N.C.1981) (35% of $2.85 million settlement); *In re Franklin Nat'l Bank Securities litigation*, [1980 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,571, at 97,988 (E.D.N.Y.1980) (Chief Judge Weinstein awarded plaintiffs' counsel 34% of the class recovery); *Baron v. Commercial & Industrial Bank of Memphis*, [1979–80 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,132, at 96,244 (S.D.N.Y.1979) (36% of $900,000 settlement); *Steinberg v. Carey*, 470 F.Supp. 471, 480 (S.D.N.Y.1979) (Weinfeld, J.) (25% of settlement); *Munsey Trust v. Sycor, Inc.*, 457 F.Supp. 924, 928 (S.D.N.Y.1978) (fees and expenses: almost 30%); *In re Scientific Control Corp.*, 80 F.R.D. 237, 243–44 (S.D.N.Y.1978) (almost 30% of the recovery); *Adams v. Standard Knitting Mills, Inc.*, [1978 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,377, at 93,307–09 (E.D.Tenn.1978) (almost 30% of $3,343,385.25 damage award after trial); *Zinman v. Avemco Corp.*, [1978 Tr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,325, at 93,092–93 (E.D.Pa.1978) (50% of $260,000 settlement); *City of New York v. Darling-Delaware*, 440 F.Supp. 1132, 1133, 1136 (S.D.N.Y.1977) (almost 25% of settlement); *Beecher v. Able*, 435 F.Supp. 397, 415–19 (S.D.N.Y.1977) (22% of settlement); *Seiffer v. Topsy's International, Inc.*, 70 F.R.D. 622, 635 n. 12 (D.Kan.1976) (30% of recovery); *see also J.N. Futia Co. v. Phelps Dodge Industries, Inc.*, 1982 Trade Cases (CCH) ¶ 64,978, at 73,070 (S.D.N.Y.1982) (20% is near "the lower end of the range of what we would commonly understand to be a reasonable contingent fee for a major recovery"); *Rosenfeld v. Black*, 56 F.R.D. 604, 605–06 (S.D.N.Y.1972) (fee awards in 20% to 30% range, with collected cases). In view of the foregoing, the present request for a fee of slightly less than 25% of the settlement fund is quite reasonable in relation to the fees typically awarded in complex class actions.

### 6. *Public Policy Considerations*

■ The federal securities laws are remedial in nature and, in order to effectuate their statutory purpose of protecting investors and consumers, private lawsuits should be encouraged. *See Eichler v. Berner*, — U.S. —, 105 S.Ct. 2622, 2628, 86 L.Ed.2d 215 (1985); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance of State of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971); *White v. Abrams*, 495 F.2d 724, 730–31 (9th Cir. 1974). Indeed, the ultimate effectiveness of these remedies may largely depend on the efficacy of the class action device. 3 Loss, Securities Regulation 1819 (2d ed. 1961).

In *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), the Fifth Circuit recognized that fees should be adequate "to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical burden of [litigation under the federal statute involved]." *Id.* at 719–20. The court observed that "[a]dequate compensation [for successful counsel in contingent cases] is necessary . . . to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession." *Id.* The Second Circuit has voiced the same concern in the analogous context of antitrust class actions. *See Alpine Pharmacy*, 481 F.2d at 1050 ("In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation.")

Fair awards in cases such as this encourage and support other prosecutions, and

thereby forward the cause of securities law enforcement and compliance. *E.g., Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969); *Minnesota Mining and Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318–19, 85 S.Ct. 1473, 1477, 14 L.Ed.2d 405 (1965). As stated in *King Resources:*

A proper balance must be struck which takes into account public policy considerations. The allowance must be sufficiently generous, in those cases in which a recovery is effected, to encourage competent counsel to accept representation in these private actions, which vindicate the Congressional purposes of the federal securities laws....The allowance of fees should have for a consideration sufficient incentive to competent counsel to remain in the field of public interest litigation. As one district court has recently stated, "To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding. The concept of a private attorney acting as a 'private attorney general' is vital to the continued enforcement and effectiveness of the Securities Acts." *Bleznak v. C.G.S. Scientific Corp.*, 387 F.Supp. 1184, 1189 (E.D.Pa.1974).

420 F.Supp. at 636.

Accordingly, public policy favors the grant of plaintiffs' counsels' motion for the award of attorney's fees and costs in the amount of $4,509,090.08.

### D. *Objections*

There were two objections to the settlement proposal and one objection to the attorney's fees request filed with this Court. Apparently, four other objections to the settlement were sent to plaintiffs' counsel, but not filed with the Court. Plaintiffs' counsel has graciously furnished the Court with copies of the unfiled objections. Each is addressed below.

#### 1. *Objections to Settlement*

##### a. *Gross Objection*

The most substantive objection to the settlement has been filed by Stephen J.

Gross. He was the only objector to appear, and be heard, at the settlement hearing. Gross does not object to the size of the settlement. In fact, he calls it "spectacular." (Objector's Memorandum at 9). Gross, however, objects to what he views as the fact that Warner, rather than the individual defendants, is the source of most of the settlement funds. He argues that the individual defendants, accused in the Complaint of insider trading, should bear a much more substantial share of the settlement. Gross also accuses the parties of collusion.

#### i. *Collusion*

 The Court begins with Mr. Gross' allegation of collusion. Mr. Gross' only basis for this charge is the absence of vitriol during the course of the litigation. It is true that plaintiffs' and defendants' counsel did not come to Court to resolve every minor discovery dispute. It is further true that, after lengthy negotiations, counsel were able to work out such major issues as class certification and ultimately were able to settle this entire lawsuit. Settlement, however, is hardly *prima facie* evidence of collusion. Counsel acted reasonably and professionally toward one another. There is little doubt that counsel for both sides represented their clients diligently. As Warner's counsel, Arthur Liman, said at the settlement hearing in describing the nature of the depositions in this case:

Every time Mel Weiss [plaintiffs' co-lead counsel] asked a question of top officials at Warner with a smile on his face and with a low voice, my heart was in my mouth.

(Transcript at 26). Counsel deserve only to be commended, not criticized, for the way in which they conducted this litigation.

#### (ii) *Source of Funds*

With respect to Gross' second point, regarding the source of the settlement funds, it is factually without foundation and legally without merit. Gross basically claims that plaintiffs' insider trading claims,

against the individual defendants, particularly against Warner Chairman, Steve Ross, were strong and the fraud-on-the-market claims against Warner and Atari were relatively weak. Gross, however, fails to counter Ross' sworn contention that he had to sell his Warner stock, in accordance with a pre-existing publicly announced financial plan, in order to exercise soon-to-expire stock options and pay the taxes due thereon. *See supra* p. 742. In addition, the SEC's failure to pursue most of the individual defendants does not bode well for the success of the insider trading claims.

■ In contrast, plaintiffs' fraud-on-the-market claims, while disputed, have some support. While defendants would attempt to demonstrate that Warner could not be held liable since it did not trade in its own stock during the class period, plaintiffs would rebut with the line of cases holding that, even in the absence of trading by the corporation, there exists a general duty to refrain from making misleading statements to the investing public. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968) (en banc) ("There is no indication that Congress intended that the corporations or persons responsible for the issuance of a misleading statement would not violate [Section 10(b)] unless they engaged in related securities transactions ... indeed, the obvious purposes of the Act to protect the investing public and to secure fair dealing in the securities markets would be seriously undermined by applying such a gloss onto the legislative language."), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *see also Sargent v. Genesco, Inc.*, 492 F.2d 750, 759–61 (5th Cir.1974); *Heit v. Weitzen*, 402 F.2d 909, 913 (2d Cir.1968), *cert. denied*, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 101–02 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); *Mount Clemens Industries Inc. v. Bell*, 464 F.2d 339, 342–43 n. 6 (9th Cir. 1972). Even in the absence of trading, Warner had a duty to correct prior material statements as they became inaccurate. *See, e.g., Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir.1980); *Ross v. A.H. Robins Co. Inc.*, 465 F.Supp. 904, 908 (S.D.N.Y.), *rev'd on other grounds*, 607 F.2d 545 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

In addition, the requisite degree of scienter is likely to be easier to attribute to Warner than to the individual defendants. As to Warner, plaintiffs arguably need only show either that one or more members of top management knew of material information indicating an earnings decline, but failed to stop the issuance of misleading statements or to correct prior statements that had become misleading, or that Warner management had recklessly failed to set up a procedure that insured the dissemination of correct information to the marketplace. In contrast, the scienter of each individual defendant would not be as easily shown. For each individual defendant, plaintiffs would have to establish that he traded and that each individual trade was made on the basis of material non-public information. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Such offers of proof for each individual trade by each individual defendant would impose a more substantial burden than a similar showing of scienter as to Warner.

If the insider trading claims against the individual Warner officers were established, that is, that they traded based on undisclosed material information, then surely Warner would be deemed, through its officers, to have undisclosed material information that it had a duty to disclose in order to correct prior or contemporaneous statements. Such proof would likely expose Warner to considerably greater liability than that of the individual defendants. If all the insider trading claims were proven, this Circuit's remedy of disgorgement would only yield at most approximately $9.3 million. Warner, however, would be subject to approximately $148 million in damages for plaintiffs' fraud-on-the-market

claims. Thus, even if Mr. Gross were correct as to the strength of plaintiffs' insider trading claims against the individual defendants, the availability of such proof would expose Warner to infinitely greater liability than it would the individual defendants.

Nonetheless, the individual defendants are causing a substantial sum to be contributed to the settlement fund. The total amount of this federal class action and the Delaware state derivative action settlement is approximately $17.5 million, plus interest. The individual defendants are contributing $2 million into the state settlement fund. In addition, the $290,000 disgorged by defendants Groth and Kassar, pursuant to SEC consent decrees, will be paid into the class action settlement fund. Finally, the insurance carrier for the individual defendants is contributing $6 million. In sum, the individual defendants will cause more than $8 million to be contributed to the $17.5 million settlement.

Both sides in this action agree that the primary claims are those against Warner for dissemination of materially misleading documents. The allegations against the individual defendants were included primarily to support the scienter allegation against Warner, through its officers. Warner's exposure is many times greater than that of the individual defendants. In addition, any showing of intentional fraud at trial would preclude Warner from sharing settlement costs with its insurance carrier.

██ Thus, the basis of Gross' objection, that the individual defendants are not bearing their rightful share of the settlement, is factually and legally incorrect. In view of the limited exposure of the individual defendants, compared with that of Warner, and the relatively weaker claims against them, the individual defendants cannot be found to be unfairly evading liability.

(iii) *Proper Site of Objection*

██ Under FRCP 23, this Court is charged with determining whether the proposed class settlement is fair to the class. The Court's role in reviewing the proposed settlement is "as a fiduciary who must serve as a guardian of the rights of absent class members." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975); *Grinnell Corp.*, 560 F.2d at 1099; *Norman v. McKee*, 431 F.2d 769, 774 (9th Cir.1970); *In re Agent Orange Product Liability Litigation*, 597 F.Supp. at 758. The Court, acting as a fiduciary for the class, should not become involved in the allocation *inter se* among the settling defendants. *Duban v. Diversified Mtg. Investors*, 87 F.R.D. 33, 40 (S.D.N.Y.1980); *Masterson v. Pergament*, 203 F.2d 315, 330 (6th Cir.1953); *Cannon v. Texas Gulf Sulphur*, 55 F.R.D. 308, 316 (S.D.N.Y.1972); *Fox v. Glickman Corp.*, 253 F.Supp. 1005, 1013 (S.D.N.Y.1966); *Glicken v. Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y.1964).

If Mr. Gross believes that the settlement is unfair to Warner he should pursue his objection in the Delaware Chancery Court which is considering the fairness of the derivative settlement and arrangements between Warner and its management and has the obvious expertise to do so. This Court is concerned solely with the fairness of the settlement to the class, which Mr. Gross concedes is more than adequate.

For the foregoing reasons, the Court finds Mr. Gross' objections to the proposed settlement to be without merit.

b. *Withdrawn Objections*

Sheldon and Donna Starkman objected to the settlement. These objectors, however, by order dated July 11, 1985, opted out of the class, with consent of all parties. Therefore, they no longer have standing to challenge the settlement and their objection is dismissed.

Similarly, Marilyn L. Groene objected to the settlement, though apparently no objection was filed with the Court. After counsel cleared up her confusion regarding the effect of the settlement, she withdrew her objection.

#### c. *Standing*

 Three persons, Messrs. S. Doolan, Richard M. De Lio and Stephen D. Bristow, apparently sent objections to plaintiffs' counsel, but failed to file them with the Court. All three basically argue that the settlement should benefit persons like them, who own Warner stock, but did not purchase during the class period. The law is clear that a purchaser who claims to have refrained from selling in reliance on a misleading statement does not have a claim under § 10(b) of the 1934 Act. Only a purchaser or seller of securities who is misled has standing to sue. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731–33, 95 S.Ct. 1917, 1923–24, 44 L.Ed.2d 539 (1975). Therefore, these objectors are not class members and have no standing to object to the settlement.

#### 2. *Objection to Attorney's Fees*

 Only one objection to the attorney's fees application of plaintiffs' class counsel was filed and it was filed after the July 9, 1985 deadline. Joseph D. Lewis objects to the size of plaintiffs' counsels' fees in view of the several duplicate notices he received. Mr. Lewis suggests that a special master be appointed to review the fee application.

Duplicative notice is a natural by-product of the registration of securities in both the names of the beneficial owners and the nominees. In any event, under the settlement, all the costs of notice are borne by defendants. Thus, any duplicative mailings did not deplete the settlement fund. This Court has carefully reviewed the fee application of plaintiffs' counsel, including their contemporaneous time records. Appointment of a special master is therefore unnecessary.

For the foregoing reasons, the Court finds that none of the objections warrants rejection of the proposed settlement or the fee request of plaintiffs' class counsel.

### CONCLUSION

For the foregoing reasons, the Court approves the proposed settlement of this class action and grants the motion of plaintiffs' class counsel for the award of $4,385,-000.00 in fees and $124,090.08 in expenses.

SO ORDERED.