**In re: AMERICAN BANK NOTE HOLOGRAPHICS, INC., Securities Litigation**

**In re: American Banknote Corporation Securities Litigation**

**This document relates to: All Consolidated Actions**

**Nos. 99 CIV. 0412 CM, 99 CIV. 0661 CM.**

United States District Court, S.D. New York.

Jan. 2, 2001.

Nadeem Faruqi, Faruqi & Faruqi, L.L.P., Daniel L. Berger, Bernstein, Litowitz, Berger & Grossman, L.L.P., Andrew J. Entwistle, Entwistle & Cappucci LLP, Robert I. Harwood, L.L.P., Jeffrey B. Silverstein, Wechsler, Harwood, Halebian & Feffer, New York City, for Plaintiffs.

Pomerantz Levy Haudek Block & Grossman, James Nespole, Fulbright & Jaworski, New York City, Richard B. Dannenberg, Lowey, Dannenberg, Bemporar & Selinger, P.C., White Plains, NY, Alan N. Salpeter, Peter Liaskos, Meyer, Brown & Platt, Otto G. Obermaier, Weil, Gotshal & Manges, James Mitchell, Stillman & Friedman, P.C., John Michael Vassos, Morgan, Lewis & Bockius, L.L.P., Peter Samuel Liaskos, Mayer, Brown & Platt, New York City, Boris Feldman, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Kenneth R. Puhala, Layton Brooks & Hecht, New York City, Douglas J. Clark, Feldman Boris, Geoffrey Ezgar, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, for Defendants.

## MEMORANDUM DECISION AND ORDER APPROVING CLASS ACTION SETTLEMENT AND AWARDING COUNSEL FEES AND EXPENSES

McMAHON, District Judge.

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Plaintiffs in *In re American Bank Note Holographics, Inc. Securities Litigation*, 99 Civ. 0412(CM) (the "Holographics Action") and Plaintiffs in *In re American Banknote Corporation Securities Litigation*, 99 Civ. 0661(CM) (the "ABN Action"), on behalf of themselves and the Classes (as hereinafter defined) in each consolidated action (together, the "Actions") move for final approval of the proposed global settlement (the "Settlement") with Defendants American Bank Note Holographics, Inc., ("Holographics"), and American Banknote Corporation ("ABN"); NationsBanc Montgomery Securities LLC ("NationsBanc"), Lazard Freres & Co. LLC ("Lazard Freres"), Raymond James & Associates, Inc. ("Raymond James"), and Salomon Smith Barney Holdings, Inc. ("Smith Barney") (collectively, the "Underwriter Defendants"); Morris Weissman ("Weissman"), Joshua C. Cantor ("Cantor"), Richard P. Macchiarulo ("Macchiarulo"), John T. Gorman ("Gorman"), and Patrick J. Gentile ("Gentile") (collectively, the "Individual Defendants"); and Deloitte & Touche LLP ("Deloitte") (the foregoing parties collectively referred

to hereinafter as the "Defendants"), under the terms set forth in the Global Stipulation and Agreement of Settlement (the "Stipulation") dated October 24, 2000. Plaintiffs' Counsel in the Actions have submitted the Settlement on behalf of: (1) all persons or entities who purchased Holographics common stock during the period from July 15, 1998 through and including February 1, 1999 (the "Holographics Class" and the "Holographics Class Period") for alleged violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77(k), 77(1)(a)(2), and 77(o), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5., and (2) all persons or entities who purchased ABN common stock during the period from May 2, 1996 through and including January 25, 1999 (the "ABN Class" and the "ABN Class Period"), (together with the Holographics Class, the "Classes"),[1] for alleged violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.

Plaintiffs submit that the proposed Settlement of these Actions for $14,850,000.00 in cash, 1,460,000 shares of Holographics common stock, Common Stock Purchase Warrants to purchase 863,647 shares of Holographics common stock at an exercise price of $6.00 per share (the "Holographics Warrants"),[2] and certificates representing forty percent of the Equity Reserve as defined in Defendant ABN's Plan of Reorganization (the "Gross Settlement Fund")

pursuant to the Global Stipulation and Agreement, is an excellent recovery for the Classes, thus warranting final approval by the Court.

Plaintiffs also move for approval of an award of attorneys' fees and reimbursement of expenses, consisting of 30% of the cash proceeds of the Settlement, or approximately $4.455 million, and 30% of the securities described below.

The standard for determining whether to approve the Settlement is whether the Settlement of these Actions is fair, reasonable, and adequate. Here, the Court finds that the value of the Settlement, considering the obstacles Plaintiffs and the Classes would have faced in collecting a substantially higher judgment, warrants confirmation.

*Prior Proceedings Relating to the Settlement*

On October 25, 2000, this Court entered an Order preliminarily approving the Settlement and directing that a hearing be held on December 15, 2000 to determine the fairness, reasonableness, and adequacy of the proposed Settlement. Pursuant to the Order, more than 5,000 Notices of Pendency of Class Action, Hearings on Proposed Settlement and Attorneys' Fee Petition and Right to Share in Settlement Fund (the "Notice") were mailed to potential members of the Classes and their nominees. Moreover, a summary notice was published[3] on November 9, 2000 in *The New York Times*. *See* Affidavit of Cheryl Washington, ¶¶ 5, 6, sworn to December 8, 2000 and filed herewith (the "Washington Aff."). The Notice contained a detailed description of the history of the Actions and the Settlement, a statement of the

---

1. Excluded from the Classes are the Defendants, the officers and directors of Holographics and ABN, members of each of their immediate families and each of their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded are those individuals and entities, if any, that excluded themselves from the Classes by properly submitting requests for exclusion.

2. The Holographics Warrants are valued at $0.23 Per Warrant.

3. Pursuant to the proposed Plan of Allocation, only members of the Holographics Class are eligible to receive the Holographics common stock and Holographics Warrants.

maximum attorneys' fees and costs to be sought, a description of the claims that will be released, the deadlines for filing proofs of claim, and the time and place of the Settlement Fairness Hearing (the "Hearing"). The Notice further advised members of the Classes of their right to object to the Settlement by filing and serving a written objection by December 8, 2000, and of their right to exclude themselves from participating in the Settlement by properly submitting a request for exclusion by December 8, 2000.

As discussed more fully below, no objections to the proposed Settlement have been received to date. Washington Aff. ¶ 7.

*Negotiations Leading to the Settlement*

The proposed Settlement was reached only after a comprehensive assessment of the results of Plaintiffs' Counsels' investigation into the facts. Plaintiffs' Counsel represent to the Court, without contradiction, that they have carefully reviewed and analyzed thousands of pages of documents produced by Defendants and certain non-parties and have conducted numerous substantive interviews of certain non-parties with knowledge of the events underlying the Actions. They further represent that the proposed Settlement was reached only after extensive, arm's-length negotiations with highly experienced and formidable counsel for Defendants and counsel for their insurer, as well as ABN's bankruptcy counsel and other counsel involved in the bankruptcy proceedings, and after extensive discussions regarding the strengths and weaknesses of the parties' respective positions.

This Settlement was reached against the backdrop of ABN's pending bankruptcy and pending investigations by both the U.S. Attorney's Office and the Securities and Exchange Commission. All of these proceedings had the potential to jeopardize Plaintiffs' ability to recover on behalf of the class. While Plaintiffs' Counsel believed that they had constructed a strong liability case against Defendants, they re-

alized and this Court realizes that the potential for a larger recovery was threatened by, *inter alia*, ABN's bankruptcy and Holographics' weakened financial condition. With that in mind, the Settlement, containing a significant cash component, is particularly impressive.

Plaintiffs also move for approval of their request for attorneys' fees in the amount of 30% of the cash recovery, or approximately $3.45 million, and 30% of the securities described above. While the Court agrees that plaintiffs' counsel are deserving of a significant fee award for their diligent efforts in the face of significant obstacles, I find that a 30% award is on the high side. Moreover, because it guarantees plaintiff's counsel that their hourly fees and then some will be paid in cash, which means that counsel will not be required to take the same risk with respect to the securities portion of the settlement that their clients will face, I do not believe is appropriate. The Court will award fees in the amount of 25% of the total recovery, together with $280,830.17 for out-of-pocket expenses.

*History of the Litigation*

Beginning in early 1999, a series of class actions was filed against Holographics, ABN, Weissman, Cantor, Macciarulo, and the Underwriter Defendants alleging violations of the Securities Act and the Exchange Act based upon Defendants' false and misleading statements concerning Holographics' business and financial condition. Subsequently, separate class actions were filed against ABN, Weissman, Gorman, and Gentile alleging violations of the Exchange Act based upon these Defendants' false and misleading statements concerning ABN's financial condition. On April 9, 1999, the Court consolidated the ABN class actions for pretrial purposes and consolidated the Holographics class actions for pretrial purposes.

On May 10, 1999, Plaintiffs in the Holographics Action filed their Consolidated Class Action Complaint, and Plaintiffs in

the ABN Action filed their Consolidated Class Action Complaint. In addition to the Defendants referenced above, the Holographics Plaintiffs named Deloitte as a Defendant in the Holographics Action. Thereafter, all but two of the Defendants filed motions to dismiss the Complaints in both Actions pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6). Cantor and Deloitte, two of the Defendants in the Holographics Action, answered the Holographics Complaint. The Holographics Plaintiffs and the ABN Plaintiff opposed the motions.

On April 6, 2000, the Court issued a Memorandum Order and Decision granting Defendant ABN's motion to dismiss Plaintiffs' claim under Section 11 of the Securities Act, but otherwise denying Defendants' motions. The Court's April 6, 2000 Order denying Defendants' motions to dismiss both Actions lifted the stay of discovery mandated by the Private Securities Litigation Reform Act during the pendency of a motion to dismiss. Plaintiffs in both Actions then immediately sought Defendants' compliance with Plaintiffs' discovery demands and sought additional discovery from certain non-parties.

During the course of the litigation, Defendants provided several thousand pages of documents which were thoroughly reviewed by Plaintiffs' Counsel. These documents included, *inter alia:* various Holographics and ABN corporate and financial documents, documents submitted in connection with ABN's bankruptcy, work papers for the relevant fiscal periods prepared by Holographics' and ABN's auditors, documents prepared by the special investigative committees convened by ABN's and Holographics' respective Boards of Directors to investigate the improprieties alleged in the Actions, and documents submitted by third parties, including MasterCard and Crown Roll Leaf, Inc.

As set forth in further detail in the Affidavit of Vincent R. Capucci, Esq., Plaintiffs' Counsels' efforts also included detailed responses by certain Plaintiffs to certain Defendants' discovery requests and the defense of depositions regarding class certification. Counsel further expended considerable effort in connection with proceedings before the Bankruptcy Court relating to ABN's Plan of Reorganization, which resulted in the allocation of 40% of ABN's Equity Reserve (as defined in ABN's Plan of Reorganization) to the funds constituting the proposed Settlement. This discovery informed the negotiations over the terms of the settlement.

At a time when the parties had almost agreed to the settlement of these Actions, Deloitte moved for leave to amend its answer and to assert cross-claims against certain Defendants. This jeopardized settlement prospects. Eventually, Deloitte decided to participate in the Settlement, which permitted the approval process to proceed.

*The Standards For Judicial Approval of a Settlement Under Rule 23(e)*

■ "The law favors settlements of class actions no less than of other cases." *In re Gulf Oil/Cities Serv. Tender Offer Litig.,* 142 F.R.D. 588, 590 (S.D.N.Y.1992) (citing *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982)); *see, also In re Blech Sec. Litig.,* No. 94 CIV. 7696, 2000 WL 661680, *1 (S.D.N.Y. May 19, 2000) (Exhibit 1)[4]; *Adair v. Bristol Technology Systems, Inc.,* No. 97 CIV. 5874, 1999 WL 1037878, *1 (S.D.N.Y. Nov. 16, 1999) (Exhibit 2). The proposed Settlement more than satisfies the criteria for final approval set forth by the Second Circuit. *See In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 740–41 (S.D.N.Y. 1985), aff'd, 798 F.2d 35 (2d Cir.1986); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974).

■ Approval of the Settlement is within the Court's broad discretion. *See In re PaineWebber Ltd. Partnerships Litig.,* 171 F.R.D. 104, 124 (S.D.N.Y.1997), aff'd, 117

---

**4.** Exhibits are set forth in an accompanying Compendium of Unreported Decisions.

F.3d 721 (2d Cir.1997). *See also Blech,* 2000 WL 661680, at \*3. In its exercise of that discretion, the Court must engage in a careful balancing act: "The Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Grinnell,* 495 F.2d at 462. *Grinnell* also instructs:

> It is not necessary in order to determine whether an agreement of settlement and compromise shall be approved that the court try the case which is before it for settlement .... Such procedure would emasculate the very purpose for which settlements are made. The court is only called upon to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable.

*Id.* (citing *Neuwirth v. Allen,* 338 F.2d 2 (2d Cir.1964)). *See also Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir. 1982) (The "court does not adjudicate the dispute").

*Evaluation of The Settlement Demonstrates that it is Fair, Reasonable And Adequate*

■ The factors that the Court should consider in reviewing the Settlement are:

a) the complexity, expense and likely duration of the litigation;

b) the reaction of the class (or classes) to the Settlement;

c) the stage of the proceedings and the amount of discovery completed;

d) the risks of establishing liability;

e) the risks of establishing damages;

f) the risks of maintaining the class action through trial;

g) the ability of the defendants to withstand a greater judgment;

h) the range of reasonableness of the Settlement Fund in light of the best possible recovery; and

i) the range of reasonableness of the Settlement Fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell,* 495 F.2d at 463. *See also Blech,* 2000 WL 661680, at \*3–4; *Adair,* 1999 WL 1037878, at \*2.

*The Complexity, Expense and Likely Duration of the Litigation*

■ These Actions, like most securities fraud cases, are complex and challenging as regards both liability and damages. While ABN and Holographics have admitted that there were errors in their earnings reports and books and records, it is a far cry from that to an adjudication of securities fraud. Defendants, represented by excellent counsel, had already made weighty motions and could be expected to mount a vigorous defense. The pendency of the bankruptcy and the Federal civil and criminal investigations added layers of complexity to an already complex matter. Plaintiffs' Counsel appropriately weighed this uncertainty against the tangible and immediate benefits conferred by the Settlement.

Moreover, Plaintiffs faced major obstacles to recovery even if they prevailed at trial. While it appeared that certain of the Individual Defendants were liable, their lack of substantial assets rendered them substantially judgment proof absent sufficient insurance coverage. More important, any criminal indictment of an Individual Defendant would likely have triggered policy exclusions and negated otherwise available insurance coverage. ABN's bankruptcy meant that others were competing for the same limited pot of assets. And Defendant Holographics has ongoing financial difficulties and protracted litigation may have forced Holographics into bankruptcy and foreclosed significant recovery for the Holographics Class. All of this militated in favor of settlement.

Settlement also confers an immediate benefit. Further discovery in this case would have been (as it already had been) complex and time consuming, given that Plaintiffs were likely to encounter hostile witnesses. One Individual Defendant has already asserted his Fifth Amendment rights, and it is virtually certain that other Individual Defendants and third party witnesses might have done so, either during depositions or at trial. Complicated expert reports on damages would have led to an additional layer of discovery, and it is almost certain that some or all of the defendants would have moved for summary judgment with the same zeal that they moved to dismiss. Add on time for a trial and appeals, and the class would have seen no recovery for years. Class counsel properly considered this factor as well. See *Blech*, 2000 WL 661680, at \*4, *Adair*, 1999 WL 1037878, at \*2.

Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. This weighs in favor of the proposed Settlement. As the court in *Slomovics v. All for a Dollar, Inc.*, 906 F.Supp. 146, 149 (E.D.N.Y.1995), concluded:

> The potential for this litigation to result in great expense and to continue for a long time suggest [sic] that settlement is in the best interests of the Class.

*Id.* (citation omitted). *See also In re The Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 318 (3d Cir.1998), *cert. denied*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999) (settlement favored where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court"). The same reasoning applies to settling the Actions here, where the Settlement results in a substantial and tangible present recovery without the attendant risk that no assets would be available to satisfy potentially larger civil judgments against Defendants in the future

after further complex and protracted proceedings.

*The Reaction of the Classes to the Settlement*

■ It is well settled that "the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Sala v. National R.R. Passenger Corp.*, 721 F.Supp. 80, 83 (E.D.Pa.1989). In fact, the lack of objections may well evidence the fairness of the Settlement. *See, e.g., PaineWebber*, 171 F.R.D. at 104, 126 (S.D.N.Y.1997); *Schwartz v. Novo Indus. A/S*, 119 F.R.D. 359, 363 (S.D.N.Y.1988). *See also Blech*, 2000 WL 661680, at \*4 ("no objections to the settlement have been raised"); *Adair*, 1999 WL 1037878, at \*2 ("no objections to the Settlement or Plan of Allocation have been received"); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (affirming approval of settlement with small number of class members indicating their disapproval of the settlement indicates its acceptability); *In re GNC Shareholder Litig.*, 668 F.Supp. 450, 451 (W.D.Pa.1987) (in class action context, silence of a substantial portion of the class as to notification of the settlement may be construed as assent).

As discussed above, more than 5,000 notices were sent to potential members of the Classes or their nominees. Washington Aff. ¶¶ 5, 6. To date, not a single objection to the Settlement has been received. Id., ¶ 7. In addition, only five stockholders have sought exclusion from the proposed Settlement. Id. The favorable reaction of the Classes is strong evidence that the Settlement is fair, reasonable, and adequate.

*The Stage of Proceedings and the Amount of Discovery Completed*

■ "[T]he stage of the proceedings and the amount of discovery completed is another factor that may be considered in determining the fairness, reasonableness, and adequacy of a settlement. To approve a proposed settlement, however, the Court

need not find that the parties have engaged in extensive discovery." *In re Austrian and German Bank Holocaust Litigation,* 80 F.Supp.2d 164, 176 (S.D.N.Y. 2000) (citing *Plummer v. Chemical Bank,* 668 F.2d 654 (2d Cir.1982)). "Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to intelligently make ... an appraisal of the Settlement." *Id. See also Klein v. PDG Remediation, Inc.,* 1999 WL 38179, *1, *3 (S.D.N.Y. Jan. 28, 1999) ("Although no depositions had occurred, Defendants had had frank discussions with Plaintiff's counsel regarding the scope of Defendants' testimony at trial. Plaintiffs' counsel had reviewed several documents relating to the alleged misrepresentations. Additionally, Defendant's motion to dismiss was fully briefed, providing the Court with some assurance that Plaintiff's counsel had an opportunity to consider the legal and factual merits of their claims and of the defenses asserted.").

Prior to reaching the Settlement, Plaintiffs' Counsel herein analyzed and investigated the events and transactions alleged in the Actions. Plaintiffs reviewed thousands of pages of documents produced by Defendants and certain non-parties and conducted interviews of people with knowledge of the facts alleged in the Actions. The parties also exchanged their positions during numerous settlement conferences. And while formal discovery was not very far along, and was stayed as to ABN by the pendency of the bankruptcy filing, the fact that proceedings were ongoing in the Bankruptcy Court also afforded the parties opportunities to obtain and exchange information.

Here, Plaintiffs engaged in sufficient investigation to warrant approval of the Settlement. The parties "have a clear view of the strengths and weaknesses of their cases." *Warner,* 618 F.Supp. at 745. That Plaintiffs' Counsel could make an informed decision on the merits of recommending the Settlement militates in favor

of approving it. *See PaineWebber,* 171 F.R.D. at 126.

### The Risks of Establishing Liability

■ Securities litigation such as this generally involves complex issues of fact and law, and these Actions are no exception. Not only must Plaintiffs show that Defendants' public statements during the Class Periods, and those made in connection with Holographics' July 15, 1998 initial public offering, misrepresented or omitted "material" information, but, for Plaintiffs' claims under the Exchange Act, they also must establish, among other things, that the material misstatements were made with *scienter.* Here, Defendants have vigorously denied that they acted with *scienter.*

Plaintiffs acknowledge the substantial risk involved in proving *scienter,* because it goes directly to a defendant's state of mind, and proof of state of mind is inherently difficult. *See, Adair,* 1999 WL 1037878, at *2 ("Plaintiffs would have to prove that Defendants acted with *scienter,* a difficult burden to meet ... ").

While Plaintiffs remain confident of their ability to prove their claims and to effectively rebut Defendants' contentions, this Court recognizes that a jury could find otherwise. The risks of proving liability militates in favor of the Settlement.

### The Risk of Establishing Damages

■ In addition to defenses on liability, Defendants surely would have asserted substantial defenses regarding damages in summary judgment motions and/or at trial. Plaintiffs' Counsel and Defendants' Counsel had extensive discussions about damages during the course of settlement negotiations. In contrast to Plaintiffs' assertions, Defendants contended that little or no damages existed and indicated that loss causation would be highly contested. Indeed, the damage assessments of Plaintiffs' and Defendants' experts who would be called at trial were sure to vary substantially, thus precipitating a "battle of the experts." In such a battle, Plaintiffs'

Counsel recognize the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount of Plaintiffs' losses. *See, e.g., PaineWebber,* 171 F.R.D. at 129 (noting the unpredictability of the outcome of a battle of damage experts). As Judge Keenan has observed:

> Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages .... In this 'battle of experts,' it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions.

*Warner,* 618 F.Supp. at 744–45 (citations omitted).

Consequently, while Plaintiffs believe that their claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest. This is particularly true in light of the substantial risk of possible non-collectibility of any judgment posed by ABN's bankruptcy, Holographics' weakened financial condition, and the possible negation of certain Individual Defendants' insurance coverage.

*The Risks of Maintaining the Class Action Through Trial*

There is no issue here. While this Court's Preliminary Order In Connection With Settlement Proceedings (the "Preliminary Order") certified the classes for settlement purposes only, I was virtually certain to grant Plaintiffs' Motion for Class Certification in the Holographics Action, which was unopposed and which appears to be to be meritorious.

*The Ability of the Defendants to Withstand a Greater Judgment*

▪ Here, there is a serious question as to the ability of the Defendants to with-

stand a greater judgment. Plaintiffs believe that total damages faced by the Holographics Class alone were approximately $80 million. After the Actions were filed, ABN, a Defendant in both Actions, filed for bankruptcy protection. As discussed above, Holographics' financial condition was substantially weakened at the time of settlement discussions, and the possibility of Holographics' filing for bankruptcy protection increased with the passage of time. Additionally, protracted litigation and factual findings, including civil and criminal investigations of certain of the Individual Defendants, carried the potential to jeopardize the Individual Defendants' insurance coverage. Moreover, the due diligence defense and indemnity provisions in the underwriter agreements potentially available to the Underwriter Defendants may have prevented the Classes' recovery of damages from such Defendants. Additional defenses available to Deloitte, and the issue of joint and several liability versus proportionate liability, were open and considered by Plaintiffs' Counsel.

Despite all this, Plaintiffs' Counsel negotiated a Settlement of $14,850,000.00 in cash, 1,460,000 shares of Holographics common stock (having a market value of approximately $2.73 million on the date of the Settlement Hearing), 863,647 Holographics Warrants (valued at 0.23 each, or just under $200,000), and certificates representing forty percent of the Equity Reserve as defined in defendant ABN's Plan of Reorganization (which carried an estimated value of $4,601,445 in papers filed with the Bankruptcy Court). The total estimated value of the Settlement exceeds $21 million, with slightly more than ⅔ of that amount in cash. In the Court's experience, this is an extremely favorable result for the class.

Without the Settlement, Plaintiffs may well have obtained substantially less or no recovery from some of the Defendants. In addition, to the extent that the Individual Defendants had the ability to contribute to any judgment obtained, such contribution

likely would be insufficient to wholly satisfy such judgment. In light of the foregoing, the Settlement is certainly fair, reasonable and adequate.

*The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and Litigation Risks*

 Although Plaintiffs and Defendants sharply disputed the amount of damages allegedly sustained by the Classes, the Settlement provides a substantial financial recovery. In *Grinnell*, the Second Circuit noted that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. The Court further noted, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n. 2.

In this context, the Court's determination turns on whether the Settlement falls within a "range of reasonableness." *PaineWebber*, 171 F.R.D. at 130 (citations omitted). Recognizing the "litigation risks" facing the Classes at trial on liability and damages—particularly factoring in the question of collectability—the amount of this Settlement is well within that range. *Id.* at 131. *See also Blech*, 2000 WL 661680, at *5 ("While additional years of litigation might well have resulted in a higher settlement or verdict at trial, continued litigation could also have reduced the amount of insurance coverage available and not necessarily resulted in a greater recovery.") *Id.*

*The Settlement Negotiations*

 In assessing a settlement, courts often focus on the "negotiating process by which the settlement was reached." *Weinberger*, 698 F.2d at 74. Courts have looked to ensure that the settlement resulted from "arm's-length negotiations" between counsel possessed of "experience and ability necessary to effective representation of the class's interests." (citation omitted). *Id. See also PaineWebber*, 171 F.R.D. at 125 ("[G]reat weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.") (citation omitted); *see also Blech*, 2000 WL 661680, at *5. The qualified and experienced counsel for all sides here recommend final approval of the Settlement.

The Settlement negotiations here were extensive, hard fought and took place over the course of many months at arm's-length between experienced and skilled attorneys for both Plaintiffs and the numerous Defendants. ABN's bankruptcy further complicated the process, in that Plaintiffs' Counsel not only negotiated with ABN's litigation counsel, but also negotiated with ABN's bankruptcy counsel, as well as with counsel for the claimants competing for the estate's assets. Additionally, the Court is aware of the obstacles presented by Deloitte with respect to the partial settlement initially reached. After further difficult negotiations among counsel for all parties, the proposed Global Settlement was reached. "So long as the integrity of the arm's length negotiation process is preserved . . . a strong initial presumption of fairness attaches to the proposed settlement." *PaineWebber*, 171 F.R.D. at 125. *See also Blech*, 2000 WL 661680, at *5. That presumption clearly should attach here.

*Plan of Allocation*

To participate in the Settlement, members of the Classes must file acceptable Proofs of Claim to become Authorized Claimants. Under the proposed Plan of Allocation, described more fully in the Cappucci Affidavit and in the Notice, the Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Cash Settlement Fund and Net Settlement Securities based upon each Authorized Claimant's Recognized Claim. With respect to 84.175% of the Net Cash Settlement Fund, each Authorized Claim-

ant shall be allocated a *pro rata* share based upon his, her, or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants.[5] The remainder of the Net Cash Settlement Fund shall be distributed only to the members of the Holographics Class under the Stipulation's Plan of Allocation.

The net shares of Holographics common stock and the Holographics Common Stock Purchase Warrants will be distributed only to members of the Holographics Class in proportion to the Authorized Claimant's Recognized Claim from purchases of Holographics common stock during the Holographics Class Period as compared to the total Recognized Claims only from purchases of Holographics common stock during the Holographics Class Period of all Authorized Claimants, as determined by the Claims Administrator. No fractional shares or Warrants shall be issued and no shares or Warrants shall be issued to any Authorized Claimant who would not be entitled to receive at least five (5) shares or five (5) warrants based on the initial proration of shares and Warrants to Authorized Claimants. No adjustment will be made in the cash distributions for fractional shares or Warrants nor for the minimum number of shares or Warrants.

To the extent not previously sold or distributed, the net shares of ABN common stock and ABN warrants will be distributed to the members of the Classes in proportion to the Authorized Claimant's Recognized Claims as determined by the Claims Administrator. No fractional shares or warrants shall be issued and no shares or warrants shall be issued to any Authorized Claimant who would not be entitled to receive at least five (5) shares or five (5) warrants based on the initial proration of shares to Authorized Claimants. No adjustment will be made in the cash distributions for fractional shares or

warrants nor for the minimum number of shares or warrants.

 Under the proposed Plan of Allocation, described more fully in the Cappucci Affidavit, each authorized claimant will receive a *pro rata* share of the Net Settlement Fund, less certain fees and expenses, to be determined by the ratio that such authorized claimant's Recognized Claim bears to the total allowed claims of the respective authorized claimants in each Action. Cappucci Aff. ¶¶ 32–38. The Plan of Allocation was formulated by Plaintiffs' Counsel after extensive consideration of the damages in each of the Actions and of the strengths and weaknesses of the claims in each Action.

The proposed Plan of Allocation is fair and reasonable and should be approved by the Court.

 All aspects of settlement approval, including, but not limited to, the Plan of Allocation, rest in the sound discretion of the district court. *See, e.g., In re Ivan F. Boesky Securities Litigation,* 948 F.2d 1358, 1368 (2d Cir.1991); and *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* [1995–1996 Transfer Binder] Fed. Sec. L. Rep.(CCH) ¶ 98,978, at 93,759–760 (S.D.N.Y. Nov. 20, 1995). District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members ... equitably." *Beecher v. Able,* 575 F.2d 1010, 1016 (2d Cir. 1978). *Accord, e.g., West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1085 (2d Cir.1971). Allocation formulas, including certain discounts for certain securities, are recognized as an appropriate means to reflect the comparative strengths and values of different categories of the claim. *See, e.g., Weinberger,* 698 F.2d at 78.

 An allocation formula need only have a reasonable, rational basis, particu-

---

**5.** The Recognized Claim formula allows for distribution to members of the respective Classes based upon the relative strengths of the claims asserted by said Classes in the Actions. *See* Notice of Pendency of Class Actions, Hearings on Proposed Settlement and Attorneys' Fee Petition and Right To Share in Settlement Fund at ¶¶ 37–38.

larly if recommended by "experienced and competent" class counsel. *See White v. NFL*, 822 F.Supp. 1389, 1420–24 (D.Minn. 1993), aff'd, 41 F.3d 402 (8th Cir.1994). "The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable ....."; *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir.1983). *Accord, e.g., Maywalt v. Parker & Parsley Petroleum Co.*, 963 F.Supp. 310 (S.D.N.Y.1997), *aff'd sub nom., Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513 (2d Cir.1998).

As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight. *See, e.g., In re Salomon Inc. Securities Litigation*, No. 91 Civ. 5442, 1994 WL 265917, at *13 (S.D.N.Y. June 16, 1994); *In re RJR Nabisco, Inc. Sec. Litig.*, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,984, at 94,267 (S.D.N.Y. Aug. 24, 1992). In this case, the Plan of Allocation was the result of lengthy discussions among Plaintiffs' Co–Lead Counsel in both the Holographics Action and the ABN Action, as well as resulting from detailed assessments of the strengths and weaknesses of the claims asserted, the applicable damages, and the likelihood of recovery. Moreover, the lack of any objections suggests that approval of the Plan of Allocation is warranted.

*The Standards Governing The Award of Attorneys' Fees in This Common Fund Case*

■ Courts have long recognized that where, as in the Actions, a class plaintiff successfully recovers a fund, the costs of litigation should be spread among the fund's beneficiaries. Under this "equitable" or "common fund" doctrine established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527, 532–533, 15 Otto 527, 26 L.Ed. 1157 (1881), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work. *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). *See also Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("under the 'common fund doctrine' ... a reasonable fee is based on a percentage of the fund bestowed on the class"); *Slomovics*, 906 F.Supp. 146, 150 (E.D.N.Y.1995) ("Under the 'equitable fund' doctrine, attorneys for the representative plaintiffs in a class action litigation may petition the court for compensation from any benefits which were achieved as a result of their efforts.") (citations omitted).

■ The Supreme Court has held consistently that the percentage approach is the correct method for determining attorneys' fees in common fund cases. *See, e.g., Blum*, 465 U.S. 886 at 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164–66, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); *Trustees*, 105 U.S. at 533, 15 Otto 527. In contrast to common fund cases, the Supreme Court always has addressed the lodestar method in the context of fee shifting cases.

The Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(a)(6) ("Reform Act"), also provides persuasive support for applying the percentage method. The Reform Act states "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable *percentage* of the amount of any damages and prejudgment interest actually paid to the class ...." (emphasis added). Thus, Congress followed the Supreme Court's lead and endorsed the efficacy of the percentage approach to fee awards in common fund cases.

In recent years, a majority of the Circuit courts have approved the percentage-of-the-fund method. *See, e.g., Gwozdzinnsky v. Sandler Associates*, 159 F.3d 1346, 1998 WL 538064, *2 (2d Cir.1998) (percentage of recovery method may properly be used to calculate attorneys' fees in common

fund cases); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation,* 56 F.3d 295, 307 (1st Cir. 1995); *In re General Motors Corp. Pick–Up Truck Fuel–Tank Prods. Liability Litigation,* 55 F.3d 768, 821–22 (3d Cir.1995), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88,'133 L.Ed.2d 45 (1995); *Rawlings v. Prudential–Bache Properties, Inc.,* 9 F.3d 513, 515–17 (6th Cir.1993); *Florin v. Nationsbank of Ga.,* 34 F.3d 560, 564–65 (7th Cir.1994) (percentage approach is appropriate in common fund cases); *Gottlieb v. Barry,* 43 F.3d 474, 487 (10th Cir.1994) (authorizing percentage approach and holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condominium Ass'n. v. Dunkle,* 946 F.2d 768, 774 (11th Cir.1991) ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class."); and *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C.Cir.1993) (percentage of the fund recovered is the appropriate method of awarding fees in common fund cases).

Although the law in this Circuit has not been uniform, the trend of the district courts in this Circuit is to use the percentage of the fund approach to calculate attorneys' fees. *See In re Sumitomo Copper Litigation,* 74 F.Supp.2d 393, 397 (S.D.N.Y.1999) ("Courts increasingly have come to recognize the shortcomings of the lodestar/multiplier method as a universal rule for compensation."); *In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 484 (S.D.N.Y.1998) ("there is

strong support for the percentage approach from district courts in this Circuit"); *Slomovics,* 906 F.Supp. at 150 ("It is proper to compensate counsel based on a percentage of the common settlement fund in this type of case"); *In re Presidential Life Securities,* 857 F.Supp. 331, 334 (S.D.N.Y.1994) ("Problems encountered in evaluation of fees utilizing the lodestar approach ... have led to rejection of that method in common fund cases ... and express approval of the percentage method as an acceptable alternative."); *In re Crazy Eddie Securities Litigation,* 824 F.Supp. 320, 325 (E.D.N.Y.1993) ("Since at least the late 1980's, the trend within this Circuit has been toward the percentage of recovery method."); *Chatelain v. Prudential–Bache Securities, Inc.,* 805 F.Supp. 209, 215 (S.D.N.Y.1992) ("This Court declines to apply the lodestar method, and instead favors the use of the straight percentage of recovery method."); *Breiterman v. Roper Corp.,* [1989–1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,885, at 94,832 (S.D.N.Y. Jan. 12, 1990) ("This Court favors the percentage approach, and agrees with the critics of the lodestar method that lodestar awards promote inefficiency and impose unnecessary burdens on the court.").[6] This Court has adopted it in preference to the more familiar "lodestar" approach in one instance. (*In re Candie's Inc. Securities Litigation,* 99 Civ. 3618, bench decision dated on July 12, 2000).

The percentage method is attractive because it directly aligns the interests of the Class and its counsel and provides a pow-

---

**6.** Some courts in this District, citing *Grinnell,* have noted that the lodestar approach has been recognized as a proper basis for calculating fees in common fund cases. *See, e.g., In re PaineWebber Ltd. Partnerships Litig.,* 999 F.Supp. 719, 723 (S.D.N.Y.1998). Recently, however, the Second Circuit has held that "both the lodestar and percentage of the fund methods are available to district court judges in calculating attorneys' fees in common fund cases." *Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir.2000). In so doing, the Court noted that use of the lodestar

approach is "vexing" and involved an "inevitable waste of judicial resources." *Goldberger,* 209 F.3d at 48–49. (The court, however, refused to abandon the lodestar approach entirely, and held that the district court's use of the lodestar method was a permissible exercise of its discretion.) *Id.* at 50. Similarly, one Court in this district has noted that with employment of the lodestar method, "any of several perverse results can obtain." *In re Auction Houses Antitrust Litigation,* No. 00 CIV. 0648, 2000 WL 1372867, *1, *5 (S.D.N.Y. September 22, 2000).

erful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system.

Courts in this district have also noted that the percentage approach is "uniquely the formula that mimics the compensation system actually used by individual clients to compensate their attorneys." *Sumitomo*, 74 F.Supp.2d at 397. In *Sumitomo*, the court stressed that the percentage of the recovery formula often serves as a favorable substitute for more costly judicial monitoring. *Id.* Moreover, courts have recognized that the percentage of the recovery formula can serve as a proxy for the market in setting counsel fees. *See In re Continental Illinois Securities Litigation*, 962 F.2d 566, 568 (7th Cir.1992) (explaining that the goal of the fee setting process "is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order.").

■ This Court agrees that plaintiffs' counsel have obtained a fine result for their clients and deserve a substantial fee award. I also have no difficulty accepting Plaintiffs' Counsel's suggestion that I adopt the percentage of recovery method to determine their fees. The harder question is what percentage of the recovery to award.

Counsel have represented to this Court that they have incurred almost $3.5 million in time charges prosecuting this case, representing some 9500 hours worked. At first blush, the number of hours worked seems excessive, even though I recognize that both the number of hours expended and the number of counsel who were forced to play preeminent roles are higher than they otherwise would have been because of the ABN bankruptcy. For example, Special Bankruptcy Counsel, whose participation in the case was not contemplated at the outset, have incurred almost 10% of the outstanding time charges. The other complicating factors discussed above required additional lawyer time as well.

Thus, for the major players at least (lead counsel for the two classes and Special Bankruptcy Counsel), I cannot say that the hours expended were excessive—although it is a close question. And the number of hours expended weighs very heavily with this Court in assessing a fee request.

I also recognize that, were I to apply the so-called "Lodestar" approach to awarding counsel fees, the fee would exceed the time charges reflected in Plaintiffs' Counsels' submission. In lodestar cases, a multiplier is typically applied, in recognition of the contingency risk and other factors. *See Weseley v. Spear, Leeds & Kellogg*, 711 F.Supp. 713, 716 (E.D.N.Y.1989) ("The most significant factor in the calculation of an upward adjustment is the risk of the litigation.") (citation omitted). Here, a multiplier would be fully justified, and amply supported by the case law. I am thus not troubled by the fact that a percentage of recovery fee, at any realistic percentage level, would exceed counsel's time charges.

What I find it troubling is that the percentage chosen by Plaintiffs' Counsel (30%) ensures that the lawyers will recover every penny of their time charges in cash, and then some, 30% of $14,850,000 being $4,455,000. They will bear no risk of being out of pocket any money. Only their "kicker" will be a function of the companies' success in getting back to business. However, their clients may well have to eat some of their losses, especially if the paper component of the Settlement turns out to be less than advertised.

I do recognize that, from the commencement of this litigation almost two years ago, Plaintiffs' Counsel have been paid nothing for their substantial and successful efforts because of the contingent nature of this litigation. The significant outlay of cash and personnel resources by Plaintiffs' Counsel has been completely at risk. Payment for Counsels' services was wholly dependent on obtaining a fair and reasonable recovery for the Classes. Giv-

en ABN's and Holographics' precarious financial situations, and the diminishing coverage available under the applicable insurance policies, there was a significant possibility that Plaintiffs' Counsel would recover nothing for their substantial efforts. I do believe it appropriate to take this risk into account in determining the appropriate fee to award. *In re "Agent Orange" Product Liability Litigation,* 818 F.2d 226, 236 (2d Cir.1987); *In re Union Carbide Corp. Consumer Products Business Securities Litigation,* 724 F.Supp. 160, 164 (S.D.N.Y.1989); *Warner,* 618 F.Supp. at 747 ("Numerous cases have recognized that the attorneys' contingent fee risk is an important factor in determining the fee award.") (citations omitted). And I do not in any way minimize the result that has been achieved, or suggest that Plaintiffs' counsel have been anything other than excellent representatives for their clients' interests. Nonetheless, I conclude that an appropriate award of attorneys' fees would require counsel to absorb some of the risk of the paper component of the settlement.

The best and least cumbersome way to accomplish that result, it seems to me, is to cut the proposed percentage award. Of course, I cannot cut it so low that Plaintiffs' Counsel are not appropriately compensated for their work. And at any realistic percentage, Plaintiffs' counsel will recover their entire time charges in cash if I adopt the administratively simple formula of giving Counsel the same fixed percentage of each component of the recovery—x% of the cash, x% of the warrants, x% of the Holographics stock and x% of the ABN Equity Reserve. Given that I cannot both fairly and simply compensate Plaintiffs' Counsel without fully compensating them for their time expended in cash, I conclude that the appropriate percentage of the Settlement that should be allocated to attorneys' fees is 25%. This will yield a total fee of approximately $5,250,000 (at the valuation of the paper component that was proffered to the Court), of which $3,712,000—an amount

that approximates the time charges—will be paid in cash.

*Plaintiffs' Counsel Should Be Reimbursed for the Out–Of–Pocket Expenses They Advanced*

Plaintiffs' Counsel's request that the Court grant their application for reimbursement of $280,830.71 in litigation expenses incurred in connection with the prosecution of this Action is granted. *See TBK Partners, Ltd. v. Warshow,* [1977 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96, 196, at 92,402 (S.D.N.Y. Oct. 5, 1977) (court noted in securities class action that "[o]f course, [Plaintiffs' Counsel] are also entitled to reimbursement for their expenses"). The expenses, which are described in detail in the accompanying Compendium of Affidavits, are of the nature of expenses approved in similar actions. They shall be paid exclusively out of the cash portion of the Settlement.

This constitutes the decision and order of the Court.